**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **TERRANCE DAUGHERTY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:19-CV-00419-MAB** |
| | ) | |
| **ANDREW GANGLOFF, ETHAN** | ) | |
| **CLARY, AND JOSHUA CRAWFORD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**BEATTY, Magistrate Judge:**

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants Andrew Gangloff, Ethan Clary, and Joshua Crawford (Doc. 109). For the

reasons explained below, the motion is denied.

<u>**BACKGROUND**</u>

Plaintiff brings this lawsuit under 42 U.S.C. § 1983 and Illinois state law for battery

and violations of his constitutional rights while he was incarcerated at Lawrence

Correctional Center ("Lawrence") (Doc. 1). Following a preliminary review of the

complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the

following counts:

> **Count 1:** John Doe #1 subjected Plaintiff to cruel and unusual punishment
> under the Eighth Amendment when he sexually assaulted Plaintiff on
> September 13, 2017.
>
> **Count 2:** John Doe #1 committed a battery under Illinois state law on
> September 13, 2017 when he sexually assaulted Plaintiff.

**Count 3:** John Doe #1 retaliated against Plaintiff in violation of the First Amendment when he sexually assaulted Plaintiff in retaliation for Plaintiff filing a lawsuit against correctional officers at Big Muddy Correctional Center.

**Count 4:** John Doe #2 and John Doe #4 were deliberately indifferent under the Eighth Amendment when they covered up the sexual assault of Plaintiff.

(Doc. 13).

Plaintiff identified John Doe #1 as Andrew Gangloff, John Doe #2 as Ethan Clary, and John Doe #4 as Joshua Crawford (Doc. 19). Defendants moved for summary judgment (Doc. 111) and Plaintiff filed a response in opposition (Doc. 122). Plaintiff's response contains a statement of additional facts (Doc. 122, p. 13-18). Defendants did not respond to Plaintiff's facts.

<u>UNDISPUTED MATERIAL FACTS</u>

At all relevant times, Plaintiff was housed at Lawrence Correctional Center (*See* Doc. 111-1, p. 29). Plaintiff has since been paroled (*Id.* at p. 14). Otherwise, the parties disagree on almost every aspect of the events in question.

*Plaintiff's Testimony*

Plaintiff testified to the following at his deposition. Plaintiff arrived at Lawrence around September 14, 2017 at approximately 9:45 p.m. (Doc. 111-1, p. 29-30). Plaintiff got off the bus with handcuffs on his wrists; the handcuffs had green paint on them (*Id.* at p. 32). During the escort, Defendant Gangloff had a confrontation with a female officer, which resulted in both of them crying (*Id.* at p. 39-40). Defendant Gangloff took Plaintiff to the Health Care Unit, where they walked past "like" 40 offenders and "like" 60 nurses

(*Id.* at p. 40-41). Defendant Gangloff escorted Plaintiff to the restroom, locked the door, and kept Plaintiff there for about 30 minutes (*Id.* at p. 40-41 & 60). Defendant Gangloff ordered Plaintiff to disrobe and bend over the sink (*Id.* at p. 42). Plaintiff asked why, and Defendant Gangloff stated it was because Plaintiff "filed a lawsuit against somebody" who worked at Big Muddy Correctional Center (*Id.* at p. 42-43 & 57). After about six minutes of conversation and two minutes of Plaintiff trying to convince Defendant Gangloff to reconsider, Defendant Gangloff forced Plaintiff to undress and assaulted him (*Id.* at p. 63). During the assault, Defendant Gangloff pulled down his pants, got on his knees in an attempt to perform oral sex on Plaintiff, and began masturbating while fondling Plaintiff's genitals (*Id.* at p. 44, 59, & 60). Plaintiff saw Defendant Gangloff's badge; he testified it said "Gangloff or something" and Plaintiff asked him if his name was Gangloff, and Defendant Gangloff responded, "yeah" (*Id.* at p. 45 & 72).

Another offender had to use another restroom because of the length of time Defendant Gangloff and Plaintiff were in the restroom, and the other offender "was pissing himself walking down the hallway" (*Id.* at p. 60). The offender ran down the hallway screaming, which is how Defendant Gangloff and Plaintiff "got caught" (*Id.*). Plaintiff heard a large crowd running down the hall towards the bathroom (*Id.* at p. 61). Defendant Clary and Nurse Curry opened the bathroom door and found Plaintiff and Defendant Gangloff (*Id.* at p. 60 & 61). Defendant Clary took about fifteen minutes to get the restroom door open (*Id.* at p. 64). Nurse Curry tried to run into the restroom but Defendant Clary picked her up by the waist and told her to leave Plaintiff alone (*Id.* at p. 61). Defendant Clary went into the restroom, beat up Defendant Gangloff, and warned

Plaintiff not to say anything (*Id.* at p. 62). Meanwhile, Defendant Crawford wrestled with

Nurse Curry while threatening her (*Id.* at p. 66).

Nurse Curry tried to call Plaintiff at 2:00 a.m. a week later (*Id.* at p. 66-67).

However, Plaintiff testified: "She quit though. They moved her somewhere like a month

later, got rid of her" (*Id.* at p. 67).

With the exception of Defendant Gangloff, Plaintiff did not recognize the names

of Defendants Crawford or Clary during the relevant events (*Id.* at p. 72). Plaintiff waited

eight months to file a grievance about the assault (*Id.* at p. 81). Plaintiff explained:

> A. . . . I was scared and I wanted to make sure I had the right people, and I
> wanted to make sure I wasn't going to an…episodic psychosis
> episode or something. So I wanted to make sure I had facts, and
> that's why it took me eight months. I had to do research and make
> sure that I understand how to file the grievance for my claim.
> . . .
>
> **Q.  And you stated you wanted to make sure that it wasn't…a
> psychotic episode? You just stated that.**
>
> A. Among—among the things, fear was the largest factor…which
> prohibited me from filing, fear of, you know, my safety and security
> at the time. . .And so it took me eight months because I wanted to
> make sure that like, you know, I wasn't just dreaming this – when it
> happened, it was a catastrophic incident for me. I kind of like went
> through a lot of depression.

(*Id.* at p. 80-81).

As a result of the sexual assault, Plaintiff has been depressed and suicidal (*Id.* at p.

89). At the time of his deposition, Plaintiff was prescribed Seroquel and Risperdal (*Id.* at

p. 8). The Seroquel is used to treat paranoid schizophrenia and bipolar disorder (*Id.*). The

Risperdal is used to treat depression, anxiety, and insomnia (*Id.* at p. 9). The medications

stay in his system about 72 hours and he had not taken the prescription for about five days at the time of the deposition (*Id.* at p. 9). Upon being paroled, Plaintiff checked himself into the Jackson Park Hospital approximately 15 times (*Id.* at p. 15-16).

### Defendant Gangloff's Testimony

Defendant Gangloff testified to the following at his deposition. Defendant Gangloff has been employed by IDOC at Lawrence as a correctional officer since 2008 (Doc. 111-2, p. 12 & 22). On September 13, 2017, Defendant Gangloff was a general relief officer assigned to the 3:00 p.m. to 11:00 p.m. shift as a Housing Unit Wing Officer in Housing Unit 5 Wing C (*Id.* at p. 56 & 65). As a general relief officer, Defendant Gangloff serves as a fill-in for officers who are gone due to sickness, vacation, training, or scheduled days off (*Id.* at p. 65). As a Housing Unit Wing Officer, Defendant Gangloff's responsibilities include escorting individuals on call passes, to recreation areas, and to chow hall for meals and documenting inmate phone calls, to ensure the safety and security of the individual (*Id.* at p. 24-25). During his shift as a Housing Unit Wing Officer, Defendant Gangloff is unable to leave unless a Zone Lieutenant relieves him (*Id.* at p. 26). He gets a 30-minute lunch break in the administration building (*Id.*).

When an individual needs to go to another area of the facility outside of his assigned housing unit, that individual is turned over to the movement officer who takes the individual from the wing (*Id.* at p. 29). The Housing Unit Wing Officer does not leave the Housing Unit (*Id.*). A Housing Unit Wing Officer would not have keys that provide him access to the Health Care Unit (*Id.* at p. 33). Officers assigned to restrictive housing are responsible for individuals who arrive on a transfer to Lawrence (*Id.* at p. 34-35).

Defendant Gangloff did not move mid-shift to assist in the transfer of offenders to Lawrence on September 13, 2017 (*Id.* at p. 70). Offenders who arrive at Lawrence are provided new jumpsuits (*Id.* at p. 38 & 86). Defendant Gangloff has never had and has never seen personalized handcuffs with color markings while working at Lawrence (*Id.* at p. 41-42). If an officer is assigned to the Operations Building for offender transfers, they received a high max rate of pay (*Id.*at p. 84). Defendant Gangloff does not know anyone who works at Big Muddy Correctional Center (*Id.* at p. 78-79).

### *Defendant Crawford's Testimony*

Defendant Crawford testified to the following at his deposition. In September 2017, Defendant Crawford was assigned to Housing Unit 6, Restrictive Housing on the 3:00 p.m. to 11:00 p.m. shift (Doc. 111-3, p. 19 & 22). Defendant Crawford was not working on September 13, 2017 or September 14, 2017 (*Id.* at p. 8-9 & 18). Defendant Crawford has never gone to work or worked a shift without it being documented on his timecard (*Id.* at p. 18). During September 2017, Defendant Crawford never went to Lawrence when he was not scheduled to work (*Id.* at p. 18-19). Defendant Crawford does not recall being involved with or assigned as an officer for the intake or transfer of offenders, including Plaintiff, from other facilities (*Id.* at p. 12 & 25).

### *Defendant Clary's Testimony*

Defendant Clary testified to the following at his deposition. On September 13, 2017, Defendant Clary worked the 3:00 p.m. to 11:00 p.m. shift and was assigned to the control pod in Housing Unit 6 (Doc. 111-4, p. 17-18). Defendant Clary was not involved in the prison intake on September 13, 2017 (*Id.* at p. 18). He has not worked the same shift

as Defendant Crawford (*Id.*at p. 15).

***Timesheets of Defendants Clary, Crawford, and Gangloff***

Defendant Crawford's timecard indicates he was not working on September 13, 2017 or September 14, 2017 (Doc. 111-5, p. 5). Defendant Gangloff's timecard indicates he did not receive max pay for working on September 13, 2017 (*Id.* at p. 3). Defendant Clary's timecard indicates he did not receive max pay for working on September 13, 2017 (*Id.*at p. 1).

***Declaration of Health Care Unit Administrator Lorie Cunningham***

Plaintiff's medical records show he received an intake exam at Lawrence on September 13, 2017 (Doc. 111-6, ¶4) (Doc. 111-9, p. 2). Generally, unless an individual is suffering from a medical emergency such as a heart attack or stroke, their intake exam is conducted in the Operations Building (Doc. 111-6, ¶6). During the initial reception screening at approximately 6:00 p.m., Plaintiff made complaints of asthma and allergies (Doc. 111-6, ¶5) (Doc. 111-9, p. 1).

On September 13, 2017, at approximately 8:20 p.m., a registered nurse conducted an intake chart review and continued Plaintiff on his previously ordered medications of Mobic, Pepcid, and an inhaler (Doc. 111-6, ¶7) (Doc. 111-9, p. 2). On September 14, 2017, at approximately 2:00 p.m., a licensed nurse practitioner conducted a new intake chart review of Plaintiff's medical records (Doc. 111-6, ¶9) (Doc. 111-9, p. 3). On September 16, 2017, Plaintiff was scheduled to be seen on the nurse sick call line but Plaintiff did not go and went to yard instead (Doc. 111-6, ¶9) (Doc. 111-9, p. 4).

The next time Plaintiff was seen by Lawrence health care staff was on September

21, 2017. Plaintiff self-reported that he had been suffering from a cold for two weeks (Doc. 111-6, ¶10) (Doc. 111-9, p. 6).

Plaintiff's medical records do not indicate that he suffered from any medical emergency upon his arrival to Lawrence on September 13, 2017 (Doc. 111-6, ¶11) (Doc. 111-9, p. 2). Outside of a medical emergency, an offender's intake exam takes place in the Operations Building (Doc. 111-6, ¶12). A maximum of 12 offenders can be in the waiting room of the Health Care Unit (Doc. 111-6, ¶13).

*Declaration of Mental Health Professional Amy Deel-Hout*

Mental Health Professional Amy Deel-Hout screened Plaintiff upon his arrival at Lawrence on September 13, 2017 at approximately 6:45 p.m. (Doc. 111-7, p. ¶4) (Doc. 111-10, p. 1-13). Plaintiff did not make any PREA complaints during his mental health screening (Doc. 111-7, ¶5) (Doc. 111-10, p. 9). During his screening, Plaintiff was referred to mental health services and was told how he could access those services (Doc. 111-7, ¶6) (Doc. 111-10, p. 9). Based on Plaintiff's evaluation, Ms. Deel-Hout determined Plaintiff did not need to be placed on crisis and she recommended Plaintiff be housed in General Population (Doc. 111-7, ¶7) (Doc. 111-10, p. 8). Plaintiff was not seen again on September 13, 2017 (Doc. 111-7, ¶8) (Doc. 111-10, p. 1-13). Plaintiff did not make any complaints regarding sexual assault by correctional staff during his initial screening (Doc. 111-7, ¶9) (Doc. 111-10, p. 1-13). It is common practice for mental health intake screenings to take place in the Operations Building (Doc. 111-7, ¶10).

*Whitney Curry's Testimony*

Whitney Curry testified to the following at her deposition. Ms. Curry is currently employed at Lawrence as a Mental Health Professional ("MHP"), on an as needed basis ("PRN") for Wexford Health sources (Doc. 116, p. 13). Ms. Curry has worked as an MPH, PRN since 2015 (*Id.*). As an MHP, PRN, Ms. Curry performs mental health evaluations and follow-up visits (*Id.* at p. 16). Follow-up visits involve meeting with patients and speaking with them about how they are feeling and documenting that information (*Id.* at p. 17). Ms. Curry does not engage in treatment of patients in her capacity as an MHP, PRN (*Id.*). In 2017, Ms. Curry only worked on Tuesdays (*Id.* at p. 30). Ms. Curry was not working on September 13, 2017 (*Id*). Ms. Curry does not remember being assaulted and does not remember witnessing an assault (*Id.* at p. 25-26 & 31-33). She does not remember if she witnessed the incident and does not know whether she was threatened (*Id.* at p. 25-27).

*Plaintiff's Living Unit History*

Plaintiff was transferred from Menard to Lawrence on September 13, 2017 and arrived at Lawrence at approximately 6:16 p.m. (Doc. 111-8, p. 2). Plaintiff was housed in Housing Unit 1, cell 16, from September 13, 2017 until September 19, 2017 (*Id.*). Plaintiff was not in Housing Unit 5 until July 25, 2018 (*Id.* at p. 1). On January 24, 2020, Plaintiff was released from IDOC custody and placed on parole (*Id.*).

*Defendants' Roster*

At Defendants' depositions, Defendants stated they had no independent knowledge of September 13, 2017 (the date in question), so they relied on a roster to determine whether they were working and what tasks they performed (Doc. 122-3, p. 56-

57 & 73) (Doc. 122-4, p. 61) (Doc. 122-5, p. 10). However, the roster contains some inaccurate information. For instance, it indicates Defendant Gangloff is a TAC officer, although he is not (Doc. 122-3, p. 67-68).

### Warden Dede Brookhart's Testimony

Warden Dede Brookhart testified at her deposition that when a busload of prisoners is transferred into Lawrence, it is an "all-hand-on-deck" situation that requires them to "move people around to get everything done that [they] can" (Doc. 122-7, p. 62).

### The PREA Investigation

PREA complaints are not simply administrative complaints and can also be criminal (Doc. 122-7, p. 37). PREA concerns and complaints are taken "very seriously," "never dismissed," and "should be fully investigated" (*Id.* at p. 25 & 36). All PREA investigations must "include a review of all direct and circumstantial evidence; any physical barriers that may have enabled the abuse or harassment; the adequacy of staffing levels; and technology needs of the facility with respect to the incident" (*Id.* at p. 29-30). When a determination is made after an investigation takes place, "unsubstantiated" means that the investigators could not determine, by a preponderance of the evidence, whether the allegations occurred; it does not indicate that the allegations did not occur as alleged (*Id.* at p. 72-73).

In May 2018, Plaintiff submitted a PREA grievance based on the sexual assault that occurred on September 13, 2017 (*Id.* at p. 79). During the investigation, Plaintiff was interviewed about the assault (*Id.* at p. 87). No other person was interviewed (*Id.* at p. 90). The investigators did not indicate that they attempted to determine what Wexford

employees were present in the Health Care Unit at the time alleged or to review the logs of inmates who would have been seen at the Health Care Unit on the day in question (*Id.* at p. 91, 92, 95, & 96). The investigation report also contains multiple errors as to dates and incorrectly references another inmate, which likely occurred because "they cut and pasted the wrong name" (*Id.* at p. 99). Plaintiff's PREA investigation packet would "absolutely not" be up to the standard Warden Brookhart would expect out of her investigators (*Id.* at p. 79, 85, & 99). The investigation involving Plaintiff's PREA complaint, based solely on his testimony, was found to be "unsubstantiated" but not "unfounded," based on a preponderance of the evidence (*Id.* at p. 76).

Warden Brookhart believes that judgment errors were made in how Plaintiff's PREA investigation was handled, including errors with thoroughness of content and the investigation (*Id.* at p. 106-07). PREA investigations can be reopened when new information is learned (*Id.* at p. 52). Warden Brookhart believes Plaintiff's PREA investigation was "probably incomplete" (*Id.* at p. 108). Warden Brookhart does not know if Plaintiff's PREA investigation has been reopened, even after Lawrence became aware of the specific names Plaintiff believes were associated with the assault (*Id.* at p. 105). Warden Brookhart "cannot say that they took [Plaintiff's PREA complaint and the investigation] seriously" (*Id.* at p. 107). Defendant Gangloff agrees that Plaintiff's allegations are serious and should be investigated under PREA (Doc. 122-3, p. 78-79). Defendant Gangloff "wonder[s] why they were not [investigated]" (*Id.*).

## LEGAL STANDARDS

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

<u>ANALYSIS</u>

## I.    Eighth Amendment and State Law Battery Claims

Defendants argue they are entitled to summary judgment because Plaintiff has not presented "concrete evidence" that the assault occurred. Defendants contend Plaintiff's claims against them are frivolous, wholly unsubstantiated, and must be dismissed because no reasonable jury could believe Plaintiff's version of events.

Defendants point out that Plaintiff initially alleged in his complaint that the sexual

assault and retaliation occurred on September 13, 2017 (Doc. 1) but testified at his deposition that the events took place on September 14, 2017 (Doc. 111-1, p. 17 & 30). Also, Defendants cite timecards, deposition testimony, and Plaintiff's medical records that suggest Defendant Crawford was not working on September 13, 2017 or September 14, 2017; Defendants Gangloff and Clary were not assigned to the Operations Building and did not assist with intake on September 13, 2017; Nurse Curry was not working on September 13, 2017; only 12 offenders are allowed in the Health Care Unit at one time; Plaintiff was not suffering from a medical emergency that would necessitate a visit to the Health Care Unit on the date in question; and Plaintiff did not state any PREA concerns during his mental health intake. Defendants argue this evidence is so inconsistent with Plaintiff's testimony that it confirms that the assault never occurred.

However, Plaintiff testified that the assault *did* occur and a party's own testimony may be used to defeat a motion for summary judgment, as long as it is based on personal knowledge. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006); *see Payne v. Pauley*, 337 F.3d 767, 771-73 (7th Cir. 2003) ("Provided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that is set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."). Defendants do not contend that any portion of Plaintiff's testimony is speculative or otherwise inadmissible. Instead, Defendants essentially argue that their evidence is more credible and more persuasive than Plaintiff's story. Of course, absent extreme

circumstances, this is not a proper inquiry for the Court at summary judgment. *United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00), 730* F.3d 711, 718-19 (7th Cir. 2013) ("Perhaps the government's evidence—composed, as it is, of official tax documents—seemed weightier than Marrocco's affidavit testimony. But, as stated above, such determinations are properly left to the trier of fact.); *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("Sometimes the heftiness of the evidence on one side, or the credulity of a particular litigant makes our task of suspending factual and credibility determinations difficult, but whatever the difficulty, we must stick to the task on summary judgment ... and avoid the temptation to decide which party's version of the facts is more likely true.").

The Court will make credibility determinations on summary judgment only in "extreme cases" where the evidence is "not just implausible, but utterly implausible in light of all relevant circumstances," such "that no rational person could believe it." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). For instance, "[i]ncredible testimony that describes an impossibility" or is "contrary to a law of nature" must be ignored. *Harris v. Schaller*, 830 Fed. App'x 787, 788-89 (7th Cir. 2020) (Mem) (unpublished) (disregarding a plaintiff's declaration where it was based on an impossibility that two inmates in two different prisons possessed the same document at the same time); *see also Machinists Dist. 10 v. GE Medical Systems, LLC*, 2008 WL 4186852, at *7 (E.D. Wis. Sept. 10, 208) (finding it "unbelievable" that a person was unaware that she hit another vehicle where the other vehicle's bumper was ripped off, the person immediately and readily admitted fault after she was confronted, and her explanations as to why she was unaware of hitting the

vehicle were "shifting").

Plaintiff's version of events is not so utterly implausible or internally inconsistent that no reasonable jury could find in his favor. Defendants' evidence about who was working at Lawrence and where they were assigned is not unassailable. Timecards and rosters can contain errors and Warden Brookhart testified that officers are moved around to assist with incoming prisoner transfers.[1] Also, it is not totally unbelievable that a correctional officer who intended to sexually assault an inmate would take the inmate to a location where the inmate was not supposed to be and where the officer was not assigned.

Moreover, Defendants state no reasonable jury could believe Plaintiff's testimony that 100 inmates were unattended and unrestrained in the Health Care Unit. But Defendants' summary of Plaintiff's testimony misses the mark. Plaintiff testified, "It's like **40** inmates in there. [Defendant Gangloff] walked me in there, left me in there by myself, shackled with the cuffs on" (Doc. 111-1, p. 41) (emphasis added). Nowhere does Plaintiff state he or the other inmates were unrestrained—in fact he specifically states he was "shackled with the cuffs on." Also, Plaintiff stated he saw 40 inmates, not 100. Otherwise, Plaintiff's description of the Health Care Unit on the date in question was made in passing, is ambiguous, and is ultimately inconsequential to Plaintiff's case. Although Defendants take issue with Plaintiff's statement now, there was no effort made to clarify the testimony during Plaintiff's deposition. Regardless, it is possible Plaintiff mis-

---

[1] In fact, Plaintiff points out an error in Defendant Gangloff's title on the roster (Doc. 122-3, p. 67-68).

estimated the number of inmates and whether they were unattended and, while certainly questionable, 40 unattended inmates is not an impossible occurrence that defies the laws of nature.

Also, the one-day discrepancy in dates between Plaintiff's complaint and his deposition testimony does not make Plaintiff incredulous as a matter of law. If Plaintiff was truly assaulted, a reasonable jury could believe that his recollection of the traumatic event is imperfect.

Defendants also contend that Plaintiff admitted the assault may have been a dream. However, Plaintiff actually testified:

> A. . . .  I was scared and I wanted to make sure I had the right people, and I wanted to make sure I wasn't going to an…episodic psychosis episode or something. So I wanted to make sure I had facts, and that's why it took me eight months. I had to do research and make sure that I understand how to file the grievance for my claim.
>
> . . .
>
> **Q.   And you stated you wanted to make sure that it wasn't…a psychotic episode? You just stated that.**
>
> A.   Among—among the things, fear was the largest factor…which prohibited me from filing, fear of, you know, my safety and security at the time. . .And so it took me eight months because I wanted to make sure that like, you know, I wasn't just dreaming this – when it happened, it was a catastrophic incident for me. I kind of like went through a lot of depression.

(Doc. 122-2, p. 80-81).

Plaintiff did not testify that he *currently* believes the assault was a dream or that he is unsure whether it occurred. He testified that he waited to pursue a grievance against Defendants until he confirmed that the incident actually happened. As best the Court can

tell, Defendants' suggestion that Plaintiff's mental health condition makes him inherently untrustworthy is not supported by the record. There simply is no evidence that Plaintiff's conditions or medications affected his deposition testimony. Any conclusion to the contrary is unsubstantiated speculation at this juncture.

Defendants cite a string of purportedly analogous cases where courts dismissed the plaintiffs' claims as frivolous: *Sakovich v. Kankakee*, 130 F.R.D. 394 (C.D. Ill. 1990); *Besecker v. Boyl*, 9 F.3d 112 (7th Cir. 1993) (Table) (unpublished), *Frey v. Board of Regents Univ. of Wisconsin Sys.*, 1995 WL 557446 (N.D. Ill. Sept. 19, 1993), *McCorkle v. Ameritech*, 1993 WL 524703 (N.D. Ill. Dec. 13, 1993), and *Minnis v. Much Shelist Freed Denenberg & Ament, P.C.*, 3 F. Supp. 2d 877, 886 (N.D. Ill. 1997). These cases involved "irrational," "fantastic," "delusional," "incredible," and "frivolous" claims, including: healthcare providers placed transistors in the plaintiff's teeth to eavesdrop on her conversations and performed procedures on her so they could read her thoughts (*Sakovich*); everyone the plaintiff came into contact with was involved in a conspiracy against him (*Besecker*); federal police officials, local and state police agencies, and a number of University of Wisconsin officials were involved in a widespread, international conspiracy and coverup in which "Japanese gangsters" forced female participants of an educational program into prostitution (*Frey*); and an employer used hypnotic mind control, placed "electronic receivers" into employees' sinuses and rectums, employed gangs and used bad body odor to harass employees, committed genocide, and threatened the plaintiff "into an[]

old lesbian" (*McCorkle*).[2]

Besides from being nonprecedential, the cases cited by Defendants are readily distinguishable from the case here. Plaintiff alleges he was sexually assaulted by a correctional officer—not that he was subjected to mind control, eavesdropping via medical procedures, or the victim of an all-encompassing conspiracy. Unfortunately, sexual assault within prisons is not so unbelievable that it constitutes a frivolous, incredible, or delusional claim.

In sum, nothing about Plaintiff's testimony or his claims present an impossibility, defy the laws of nature, are provably false at this point, or are so unbelievable that the Court can only conclude they are false. Because the parties have presented evidence to support different versions of the events in question, summary judgment is not warranted. A decision on the merits will require choosing between competing inferences, making credibility determinations, and balancing the weight of conflicting evidence. In this instance, the trier of fact must undertake these tasks.

## II.    Qualified Immunity

Defendants argue they are entitled to summary judgment on their affirmative defense of qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gibbs*

---

[2] Defendants also cite *Minnis*, where the plaintiff's claims were dismissed because she had no evidence to support her assertions and many of the allegations, even if true, failed to state a claim. 3 F. Supp. 2d 877 (N.D. Ill. 1997). Plaintiff, here, states a claim and has provided evidence in the form of his own deposition testimony to support his allegations.

*v. Lomas*, 755 F.3d 529, 536 (7th Cir. 20140 (internal quotations and citations omitted). The qualified immunity analysis involves two inquiries: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Id.* at 537. "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Id.* (emphasis in original).

Again, Defendants argue that Plaintiff cannot make out a claim for a constitutional violation because his version of events is obviously false. Defendants' argument is no more convincing in the qualified immunity context than it was with respect to Plaintiff's Eighth Amendment and Battery claims. Accordingly, Defendants' argument fails for the same reasons explained above. Otherwise, if Plaintiff's allegations are proven, his constitutional rights were violated and those rights were clearly established at the time of the alleged sexual assault. *See Little v. Walker*, 552 F.2d 193, 197 (7th Cir. 1977) (finding that sexual assaults are "manifestly inconsistent with contemporary standards of decency" and "deliberate indifference to these happening constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.") (internal quotations and citations omitted); *see also J.K.K. v. Polk Cnty.*, 960 F.3d 367, 376 (7th Cir. 2020) ("To say the sexual assaults [the correctional officer] committed against [the plaintiffs] objectively imposed serious risk to their safety[, in violation of the Eighth Amendment,] would be an understatement."). Thus, Defendants are not entitled to summary judgment on the basis of qualified immunity.

III.     **Sovereign Immunity and Public Official Immunity**

Defendant Gangloff argues sovereign immunity bars Plaintiff's state law battery

claim. The State of Illinois is protected against civil suits in federal court under Illinois'

State Lawsuit Immunity Act, 745 ILCS 5/1 *et seq.* Under the State Lawsuit Immunity Act,

"the State of Illinois is immune from suit in any court, except as provided in the Illinois

Court of Claims Act. . ., which vests jurisdiction over state tort claims against the state in

the Illinois Court of Claims." *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001) (internal

citations and quotation omitted). A claim against a state official or employee is a claim

against the state when (1) there are no allegations that an agent or employee of the State

acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to

have been breached was not owed to the public generally independent of the fact of State

employment; and (3) the complained-of actions involve matters ordinarily within that

employee's normal and official functions of the State. *Murphy v. Smith*, 844 F.3d 653, 658

(7th Cir. 2016). However, there is an exception to this rule when the plaintiff alleges the

State official or employee violated statutory or constitutional law. *Id.* at 658-59 (internal

quotations and citations omitted).

Defendant Gangloff also relies on the public official immunity defense, which is a

common law defense that states a public official is entitled to immunity where his

conduct is a good faith exercise of discretionary duties that are unique to the particular

public office. *Currie v. Lao*, 592 N.E.2d 977, 984 (Ill. 1992); *Kinzer v. City of Chi.*, 539 N.E.2d

1216, 1220 Ill. 1989).

Defendant Gangloff states that he acted within the scope of his duties and had no

contact with Plaintiff. Again, the Court will not weigh the evidence to conclude that Defendant Gangloff did not assault Plaintiff. The jury will do that. When viewing the record in the light most favorable to Plaintiff, there are genuine disputes of material fact as to whether Defendant Gangloff retaliated against Plaintiff by sexually assaulting him. Defendant Gangloff does not contend (nor can he) that sexually assaulting an inmate falls within the scope of a correctional officer's duties or is the good faith exercise of a discretionary duty. Further, Plaintiff alleges Defendant Gangloff violated his constitutional rights under the Eighth Amendment. "If the plaintiff alleges that state officials or employees violated statutory or constitutional law, sovereign immunity affords no protection." *Murphy*, 844 F.3d at 658-59. Defendant Gangloff is not entitled to summary judgment under a claim of immunity.

### CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Defendants Andrew Gangloff, Ethan Clary, and Joshua Crawford (Doc. 109) is **DENIED.** This case will be set for a ZOOM status conference by separate notice to discuss the utility of a settlement conference and trial scheduling.

**IT IS SO ORDERED.**

**DATED: June 29, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**
